UNITED STATES of America,
Plaintiff,

v.

AEY, INC., Efraim Diveroli, David
Packouz, Alexander Podrizki, and
Ralph Merrill, Defendants.

Case No. 08–20574–CR

United States District Court,
S.D. Florida.

March 24, 2009.

Eloisa Delgado Fernandez, James M. Koukios, Gerardo M. Simms, United States Attorney's Office, Miami, FL, for Plaintiff.

Howard Milton Srebnick, Black Srebnick Kornspan & Stumpf, Hy Shapiro, Hy Shapiro, P.A., for Defendants AEY, Inc. and Efraim Diveroli.

Kenneth Joseph Kukec, Miami, FL, for Defendant David Packouz.

Anita Margot Moss, Lilly Ann Sanchez, Fowler White Burnett, Miami, FL, for Defendant Alexander Podrizki.

Atlee W. Wampler, III, Joseph Randolph Buchanan, Wampler Buchanan Walker Chabrow Banciella & Stanley PA, Miami, FL, Bret W. Rawson, Darin B. Goff, Nathan A. Crane, Peter Stirba, Stirba & Associates, Salt Lake City, UT, for Defendants Ralph Merrill.

*OMINIBUS ORDER DENYING MO-
TIONS TO DISMISS (D.E.163, 164)
AND SUPPLEMENTAL MOTION
TO DISMISS (D.E. 235)*

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendants AEY, Inc. and Efraim Diveroli's Motion to Dismiss the Superseding Indictment (D.E. 163) filed on September 22, 2008, and Defendant Ralph Merrill's Motion to Dismiss the Superseding Indictment (D.E. 164) filed on September 22, 2008. Defendant Ralph Merrill joined Defendants AEY, Inc. and Efraim Diveroli's Motion to Dismiss on September 23, 2008. (*See* D.E. 165, 166.) The government filed its Omnibus Response to Defendants' Motions (D.E. 171) on October 14, 2008. Defendants AEY, Inc. and Efraim Diveroli filed their Reply (D.E. 180) on October 29, 2008, and Defendant Ralph Merrill also filed his Reply (D.E. 181) on October 29, 2008. The government filed a sur-reply to Defendants AEY, Inc. and Efraim Diveroli's Reply (D.E. 188) on November 6, 2008. Defendants AEY, Inc. and Efraim Diveroli filed a response to the government's sur-reply (D.E. 207) on December 5, 2008. Also before the Court is Defendants AEY, Inc. and Efraim Diveroli's Joint Supplement to Motion to Dismiss Superseding Indictment ("Supplemental Motion," D.E. 235) filed on February 5, 2009. The government filed a response to the Supplemental Motion (D.E. 239) on February 9, 2009. Having considered the Motions to Dismiss, the Supplemental Motion, the related papers, and the record, the Court finds as follows.

## I. Background

On or about January 26, 2007, the U.S. Army awarded a prime contract, designated number W52P1J–07–D0004 (hereinafter "the contract"), to Defendant AEY, for the procurement of non-standard ammunition for use in Soviet-era weaponry by the Islamic Republic of Afghanistan. (*See* D.E. 163–2.) The contract contains a series of clarifications, drafted in the form of questions and answers. One of the clarifications—in response to the question, "Is ammunition from China acceptable for this contract—assuming that it meets the technical specifications?"—provides: "The solicitation itself does not expressly prohibit any source of supply.... However, any other statutory or regulatory restrictions, such as exporting and importing licensing requirements, that may effectively prohibit supplies from any source are the responsibility of each offeror to both identify and resolve." (*Id.* at 9.) Several pages later, the contract expressly incorporates Defense Federal Acquisition Regulation Supplement (DFARS) 252.225–7007, Prohibition On Acquisition of United States Munitions List Items From Communist Chinese Military Companies. (*Id.* at 11–12.) DFARS 252.225–7007 is part of what will be referred to as the "the DFARS rule" in this Order. While the DFARS rule is discussed in greater detail *infra*, briefly, it is a Department of Defense ("DoD") regulation prohibiting contractors and subcontractors under contract with the DoD from delivering munitions that were acquired, directly or indirectly, from a Communist Chinese military company.

The Superseding Indictment, filed on July 17, 2008, alleges that Defendants delivered to the U.S. Army ammunition that was manufactured and originated in China in violation of the DFARS rule.[1] In order

---

1. In reviewing a motion to dismiss an indictment, the Court looks only at whether the government has alleged each of the elements of the offense charged, and, taking the allegations as true, whether a criminal offense has been stated. *United States v. Plummer*, 221 F.3d 1298, 1302 (11th Cir.2000); *see also*

to conceal the ammunition's true origin, the Defendants repackaged the ammunition and falsely represented that it had been manufactured and originated in Albania. (*See* Superseding Indictment, D.E. 78 at 5–6.)

As alleged in the Superseding Indictment, on or about April 20, 2007, AEY employee Defendant Alexander Podrizki emailed AEY employee Defendant David Packouz photographs of ammunition from containers with Chinese markings. (*Id.*) Defendant Packouz responded by email that they had to get rid of the crates with the Chinese markings since Chinese products were prohibited and would not be accepted. (*Id.*) Defendants Packouz, Podrizki, Efraim Diveroli (AEY's president), and Ralph Merrill (an AEY investor) also considered painting over the metal cases to conceal the Chinese markings and manually scraping the Chinese markings off of the wooden crates. (*Id.* at 6–7.) After being advised that the government would not allow AEY to broker Chinese ammunition, even though it had been stored by an Albanian company for about twenty years, the Defendants ultimately decided to repackage the ammunition in order to disguise its true origin. (*Id.*)

Beginning at least as early as June 21, 2007, and continuing through on or about October 31, 2007, AEY supplied the U.S. Army with repackaged ammunition manufactured in China and represented to the Army that the ammunition had been manufactured and originated in Albania (*Id.* at 8.) AEY received millions of dollars in payment for these shipments from on or about July 23, 2007, through on or about December 6, 2007. (*Id.*) AEY also used the ammunition's Chinese origin to negotiate a lower price from its supplier and increase its profit margin. (*Id.* at 7–8.)

The Superseding Indictment charges Defendants with conspiring to make false statements (18 U.S.C. § 1001) and to commit major fraud against the United States (18 U.S.C. § 1031) and wire fraud (18 U.S.C. § 1343), all in violation of the conspiracy statute, 18 U.S.C. § 371 (Count 1). Additionally, the Superseding Indictment charges Defendants with substantive false statement violations (Counts 2–36), substantive major fraud violations (Counts 37–71), and substantive wire fraud violations (Counts 72–85).

## II. Discussion

In their Motions, Defendants raise nine arguments: (1) that the munitions supplied to the U.S. Army did not violate the DFARS rule, the applicable regulation in this case, and therefore they did not conceal or misrepresent anything to the DoD; (2) that the Superseding Indictment's allegations that the munitions were "manufactured and originated" in China fail to state an offense; (3) that criminal enforcement of the DFARS rule violates the *Ex Post Facto* Clause of the Constitution because the DFARS rule was promulgated in violation of the Administrative Procedure Act (the "APA"); (4) that the regulation is impermissibly vague and unconstitutional as applied to Defendants; (5) that the wire fraud counts of the Superseding Indictment are actually breach of contract claims improperly prosecuted as fraud; (6) that the fraud counts are defective because the alleged breach of contract did not deprive the government of any property; (7) that the Certificates of Conformance—particularly the question on the Certificates of Conformance asking for "Manufacturer (Point of Origin)"—impermissibly deviate from other forms used in the government procurement process and the pertinent regulatory requirements; (8) that the

*United States v. Fitapelli,* 786 F.2d 1461, 1463 (11th Cir.1986).

prosecution is barred because the non-standard Certificates of Conformance used in this case impermissibly deviate from the applicable regulatory requirements and therefore violate the APA; and (9) that the "false statement" counts fail to state an offense because the questions that Defendants allegedly answered falsely on the Certificates of Conformance were fundamentally ambiguous. Additionally, in their Supplemental Motion, Defendants AEY, Inc. and Efraim Diveroli argue that internal emails between Department of Defense procurement personnel corroborate their interpretation of the term "Manufacturer (point of origin)" on the Certificates of Conformance, and, therefore, the entire Superseding Indictment must be dismissed As discussed below, the Court finds that these arguments are without merit.

## A. The Superseding Indictment sufficiently alleges fraud against Defendants for their concealment and misrepresentation of DFARS rule violations.

Defendants are not charged with violating the DFARS rule. They are charged with concealing and misrepresenting the fact that the ultimate source of munitions they delivered to the DoD was a Communist Chinese military company in violation of the DFARS rule. Defendants argue that the munitions were manufactured by China and sold or given to Albania prior to the enactment of the DFARS rule, and, therefore, these munitions are not prohibited under the rule. Defendants further argue that because they did not violate the DFARS rule, they did not conceal or misrepresent anything to the DoD, and the Superseding Indictment, which is premised in part on Defendants' alleged concealment and misrepresentation of the violation, must be dismissed. As discussed immediately below, Defendants' argument fails as a matter of law and facts alleging violations of law are set forth in the Superseding Indictment.

## 1. A brief background of the embargo against the Communist Chinese military

The history of American trade restrictions against China goes back nearly 60 years. In December 1950, the United States government imposed a trade embargo against the People's Republic of China (the "PRC") in response to the PRC's intervention in the Korean War. (*See* Defendant AEY, Inc. and Efraim Diveroli's Joint Motion to Vacate Protective Order, D.E. 129 at 34.) Trade restrictions between the United States and the PRC remained intact until the administration of President Richard M. Nixon commenced diplomatic efforts to normalize relations between the two countries. (*Id.* at 35; government's Omnibus Response, D.E. 171 at 13.) However, following the massacre of protesting students, journalists and workers in Beijing's Tiananmen Square in 1989, President George H.W. Bush imposed a series of sanctions on the Communist Chinese military, including prohibiting the export of defense weaponry to the PRC. (D.E. 129 at 35–36; D.E. 171 at 13.) President William J. Clinton pursued a similar policy. (D.E. 129 at 37–38; D.E. 171 at 13.) In 1994, he extended the sanctions to prohibit the importation of defense weaponry from the PRC. (D.E. 129 at 38; D.E. 171 at 13.)

## 2. Section 1211 and the DFARS rule

In 2006, in response to concerns regarding the growing strength and aggression of the PRC's military, Congress included in its National Defense Authorization Act for Fiscal Year 2006 a provision that prohibits the DoD from procuring munitions from the Communist Chinese military. Section 1211 of the National Defense Authorization Act for Fiscal Year 2006, Pub. L. 109–163, 119 Stat. 3461 (Jan. 6, 2006), Prohibition on procurements from Communist Chinese military companies, provides:

(a) Prohibition. The Secretary of Defense may not procure goods or services described in subsection (b), through a contract or any subcontract (at any tier) under a contract, from any Communist Chinese military company.

(b) Goods and services covered. For purposes of subsection (a), the goods and services described in this subsection are goods and services on the munitions list of the International Trafficking in Arms Regulations, other than goods or services procured—

(1) in connection with a visit by a vessel or an aircraft of the United States Armed Forces to the People's Republic of China;

(2) for testing purposes; or

(3) for purposes of gathering intelligence.

(c) Waiver authorized. The Secretary of Defense may waive the prohibition in subsection (a) if the Secretary determines such a waiver is necessary for national security purposes. The Secretary shall notify the congressional defense committees of each waiver made under this subsection.

(d) Definitions. In this section:

(1) The term "Communist Chinese military company" has the meaning provided that term by section 1237(b)(4) of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 (50 U.S.C. 1701 note).

(2) The term "munitions list of the International Trafficking in Arms Regulations" means the United States Munitions List contained in part 121 of subchapter M of title 22 of the Code of Federal Regulations.

The Strom Thurmond National Defense Authorization Act's definition section referenced in § 1211(d)(1) provides:

(b) Determination and reporting of Communist Chinese military companies operating in United States.

(1) Initial determination and reporting. Not later than March 1, 2001, the Secretary of Defense shall make a determination of those persons operating directly or indirectly in the United States or any of its territories and possessions that are Communist Chinese military companies and shall submit a list of those persons in classified and unclassified form....:

(2) Annual revisions to the list. The Secretary of Defense shall make additions or deletions to the list submitted under paragraph (1) on an annual basis based on the latest information available and shall submit the updated list not later than February 1, each year to the committees and officers specified in paragraph (1)....

(4) Communist Chinese military company. For purposes of making the determination required by paragraph (1) and of carrying out paragraph (2), the term "Communist Chinese military company" means—

(A) any person identified in the Defense Intelligence Agency publication numbered VP–1920–271–90, dated September 1990, or PC–1921–57–95, dated October 1995, and any update of those publications for the purposes of this section; and

(B) any other person that—

(i) is owned or controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of the People's Republic of China or that is owned or controlled by an entity affiliated with the defense industrial base of the People's Republic of China; and

(ii) is engaged in providing commercial services, manufacturing, producing, or exporting.

50 U.S.C. § 1701 note, Pub. L. 105–261, 112 Stat. 2160 (Oct. 17, 1998), *amended by*

Pub.L. 106–398, 114 Stat. 1654 (Oct. 30, 2000) and Pub. L. 108–375, 118 Stat. 2089 (Oct. 28, 2004).

In order to implement § 1211 of the National Defense Authorization Act for Fiscal Year 2006, excerpted above, the DoD issued an interim rule amending the Defense Federal Acquisition Regulation Supplement (DFARS) effective September 8, 2006. 71 Fed Reg. 53046 (the "DFARS rule"). The interim rule was adopted as a final rule without change effective March 27, 2007. 72 Fed. Reg. 14239. The DFARS rule contains the following prohibition and exceptions to the prohibition:

225.770–2 Prohibition.

Do not acquire supplies or services covered by the United States Munitions List (USML) (22 CFR part 121), through a contract or subcontract at any tier, from any Communist Chinese military company. This prohibition does not apply to components and parts of covered items unless the components and parts are themselves covered by the USML.

225.770–3 Exceptions.

The prohibition in 225.770–2 does not apply to supplies or services acquired—

(a) In connection with a visit to the People's Republic of China by a vessel or an aircraft of the U.S. armed forces;

(b) For testing purposes; or

(c) For the purpose of gathering intelligence.

48 C.F.R. §§ 225.770–2, 3. The DFARS rule also provides that the following clause must be included in solicitations and contracts involving the delivery of items covered by the United States Munitions List:

Prohibition On Acquisition of United States Munitions List Items From Communist Chinese Military Companies (SEP 2006)

(a) Definitions. As used in this clause—

Communist Chinese military company means any entity that is—

(1) A part of the commercial or defense industrial base of the People's Republic of China; or

(2) Owned or controlled by, or affiliated with, an element of the Government or armed forces of the People's Republic of China. United States Munitions List means the munitions list of the International Traffic in Arms Regulation in 22 CFR Part 121.

(b) Any supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, directly or indirectly, from a Communist Chinese military company.

(c) The Contractor shall insert the substance of this clause, including this paragraph (c), in all subcontracts for items covered by the United States Munitions List.

48 C.F.R. § 252.225–7007.

## 3. The DFARS Rule applies to the munitions delivered under the contract as alleged in the Superseding Indictment.

▮▮ Defendants contend that the DFARS rule does not apply to the munitions delivered under the contract because those munitions were purchased from Albania which in turn had bought or received the munitions from China decades ago. As described below, Defendants' interpretation is incorrect as a matter of law for a number of reasons.[2]

**2.** The Court notes that even if the munitions did not violate the DFARS rule's prohibition, Defendants might still be liable for the conspiracy, fraud, and false statement charges, depending on the materiality of their alleged deceptions and concealment.

To begin with, Defendants' interpretation conflicts with the plain meaning of § 1211 and the DFARS rule, which prohibit the sale of munitions acquired from a Communist Chinese military company, either directly or indirectly, regardless of when or through what means the munitions were so acquired. In determining the plain meaning of a statutory provision, the Court considers the words in context and the language and design of the statute as a whole. *Tyler v. Cain,* 533 U.S. 656, 662, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001); *CBS Broad. Inc. v. EchoStar Commc'ns Corp.,* 532 F.3d 1294, 1301 (11th Cir.2008). Section 1211 prohibits the Secretary of Defense from procuring certain munitions, *"through a contract or any subcontract (at any tier) under a contract,* from any Communist Chinese military company." Pub. L. 109–163, 119 Stat. 3461 (emphasis added). The plainest meaning of the phrase "though a contract or any subcontract (at any tier) under a contract" is that the Secretary of Defense may not acquire munitions that were procured from a Communist Chinese military company at any step in the supply chain. There is no explicit or implied requirement in the statute that the munitions must have been acquired from a Communist Chinese military company after a certain point to trigger the prohibition.

The regulation promulgated by the DoD to implement § 1211, the DFARS rule, further prohibits acquisition of "supplies or services covered by the United States Munitions List (USML) (22 CFR part 121), *through a contract or subcontract at any tier,* from any Communist Chinese military company." 48 C.F.R. § 225.770–2 (emphasis added). Again, like § 1211, the most straightforward interpretation of the regulation is that contractors and subcontractors cannot sell munitions to the DoD that were acquired from Communist Chinese military companies at any stage in the supply chain, without any temporal limitation. The phrase "at any tier" clearly contemplates prohibiting the procurement of munitions from Communist Chinese military companies through an intermediary like Albania. The DFARS rule further provides that solicitations and contracts for the delivery of items covered by the United States Munitions List must contain a clause that states that, "Any supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, *directly or indirectly,* from a Communist Chinese military company." 48 C.F.R. § 252.225–7007 (emphasis added). The phrase "directly or indirectly" is not ambiguous—it encompasses the entire universe of means of acquisition of munitions from a Communist Chinese military company, including those through third-party intermediary nations, regardless of when the intermediary nation acquired the munitions from the Communist Chinese military.[3]

Defendants further urge the Court to adopt their interpretation of the DFARS rule by arguing that when Congress and administrative agencies wish to ban transactions involving products that "originated" in a foreign country, no matter how long ago, they know how to do so—they ban transactions in the designated product whose "country of origin" is the embargoed country. In support of their argument, Defendants direct the Court's attention to several cases challenging other,

---

**3.** To the extent that Defendants argue that sound policy supports their interpretation of the DFARS rule, the Court declines to consider these arguments, as their interpretation is contrary to the plain meaning of the regula-

tions. *See United States v. Fisher,* 289 F.3d 1329, 1338 (11th Cir.2002) ("If the statute's meaning is plain and unambiguous, there is no need for further inquiry.").

different embargos. The Court will address the case cited by Defendants that is most on point to the situation presented in this case: a challenge to the Korean War embargo in *Heaton v. United States,* 353 F.2d 288 (9th Cir.1965).[4] Unfortunately for Defendants, *Heaton* does not support their argument. In *Heaton,* the appellant challenged his conviction under a regulation prohibiting the importation without a licence of "any merchandise" "situated outside the United States ... the country of origin of which is China (except Formosa)." 353 F.2d at 290. Appellant argued that, since the goods he imported had left China before the effective date of the regulation, December 17, 1950, the regulation's licensing requirement was not applicable to such goods. *Id.* The Ninth Circuit found that it was clear that the regulation required a license to import goods that left mainland China prior to the effective date of the regulations. *Id.* Defendants in this case appear to argue that, because the Ninth Circuit read a regulation using the term "country of origin" to apply to goods imported prior to the effective date of the regulation, had the DoD intended to ban traffic in munitions manufactured in China prior to the effective date of the DFARS rule it would have used the term "country of origin" in the DFARS rule. The Court must disagree. First, the Ninth Circuit did not address the term "country of origin" at all in its decision; it simply held that the regulation clearly applied to goods

that left China prior to the embargo. There is nothing in the decision in *Heaton* from which the Court could determine that the DFARS rule must or even may use the term "country of origin" to reach "pre-prohibition" goods. Second, even if the Ninth Circuit's reading of the regulation turned on the term "country of origin," it does not logically follow that the absence of the term in the instant, different regulation means that Congress intended that the DFARS rule *not* apply to munitions manufactured in or procured from China prior to its effective date. Defendants' argument requires an untenable inferential leap.[5]

Further, as pointed out by the government, when Congress and the executive agencies wish to except goods exported from an embargoed country prior to the effective date of a prohibition, they do so explicitly. No such exception exists in this case: "In [*Heaton* and *United States v. Hassanzadeh,* 271 F.3d 574 (4th Cir. 2001) ], the embargoes contained an explicit mechanism whereby an importer could obtain a license to import a good from an embargoed country by proving that the good had left the country prior to the embargo's effective date. Here, the DFARS rule contains no similar licensing option; there is no procedural mechanism whereby a supplier could prove that the goods were exported prior to the prohibi-

---

**4.** The other authority cited to by Defendants— for example, a challenge to the Iranian embargo in *United States v. Hassanzadeh,* 271 F.3d 574 (4th Cir.2001), and regulations related to the Cuban embargo—is either inapposite or does not actually support Defendants' position. See the Court's discussion of *Heaton, infra.*

**5.** The government makes the important point that even if Congress or the executive agencies usually used the term "country of origin" to prevent traffic in pre-embargo goods, it

would make little sense to use the term "country of origin which was China" to implement the instant embargo aimed at the Communist Chinese military. Such a formulation would be both too broad—as it would prohibit purchases of goods manufactured by companies located *inside* China that are *not* affiliated with the Communist Chinese military—and too narrow—as it would permit purchases of goods manufactured by companies located *outside* China that *are* affiliated with the Communist Chinese military.

tion." (Government's Omnibus Response, D.E. 171 at 23.)

■ Moreover, the DFARS rule explicitly provides exceptions to the prohibition, yet mentions nothing regarding an exception for munitions manufactured by or obtained from the Communist Chinese military prior to the prohibition's effective date. *See* 48 C.F.R. § 225.770-3 (excepting goods acquired in connection with a visit to the PRC by a vessel or an aircraft of the U.S. armed forces; for testing purposes; or for the purpose of gathering intelligence). When a statute "explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616-17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980). Defendants have pointed to no evidence indicating that Congress or the DoD intended to except "pre-prohibition" munitions from the ambit of § 1211 or the DFARS rule.

■ Finally, Defendants contend that the Superseding Indictment is defective because the government fails to allege therein that the Defendants procured the munitions from a Communist Chinese military company but instead alleges that the munitions were manufactured and originated in China. The Court finds this argument unpersuasive. First, the Superseding Indictment alleges that the contract was subject to the DFARS rule "which prohibited delivery of ammunition acquired directly or indirectly, from a Communist Chinese military company," Superseding Indictment, D.E. 78 at ¶ 10, and this allegation is expressly incorporated into all counts of the Superseding Indictment. More importantly, the fact that the Superseding Indictment phrases some allegations of Defendants' misrepresentations in terms of munitions "manufactured and originated in China" instead of munitions from "Communist Chinese military companies," especially when viewed in the context of the totality of the allegations of the Superseding Indictment, is not a valid grounds for dismissal.

## B Enforcing the DFARS rule does not violate the *Ex Post Facto* Clause of the Constitution.

■ The APA exempts government procurement contracts from its notice and comment requirements.[6] *See* 5 U.S.C. § 553(a) ("This section applies, according to the provisions thereof, except to the extent that there is involved—(1) a military or foreign affairs function of the United States; or (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."). Instead, as pointed out by the government in its Response and repeated below, such rules are governed by the Office of Federal Procurement Policy Act ("OFPP Act"), 41 U.S.C. § 403 *et seq.,* and its implementing regulations, the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 1.101, *et seq.*

Under the OFPP Act, "the Administrator [of OFPP] may prescribe Government-wide procurement policies," which "shall be implemented in a single Government-wide procurement regulation called the Federal Acquisition Regulation and shall be followed by executive agencies." 41 U.S.C. § 405(a). The OFPP Act authorizes agencies to implement additional procurement regulations "required to satisfy the specific and unique needs of the agen-

---

**6.** While the APA also exempts "military functions" from its notice and comment requirements, the Court need not address whether the DFARS rule falls within this exemption, as it clearly qualifies for the other exemption to the APA's notice and comment requirement, government procurement contracts. *See* 5 U.S.C. § 553(a)(2).

cy." 41 U.S.C. § 421(c)(2). Thus, the FAR provides that agencies may issue

agency acquisition regulations that supplement the FAR and incorporate, together with the FAR, agency policies, procedures, contract clauses, solicitation provisions, and forms that govern the contracting process or otherwise control the relationship between the agency, including any of its ... contractors or prospective contractors.

48 C.F.R. § 1.301(a)(1). DoD's additions to the FAR are set forth in the DFARS, 48 C.F.R., Chapter 2.

The FAR contains its own notice and comment requirement. 48 C.F.R. § 1.501–2; *see also* 41 U.S.C. § 418b. The FAR generally requires that the public be given at least 30 days to comment on a proposed rule after publication in the Federal Register, 48 C.F.R. § 1.501–2(c), but also provides that, under certain circumstances, a rule may be made "effective on a temporary basis pending completion of the public comment period." *Id.* at § 1.501–2(b)(3). Section 1.501–3(b) addresses when these certain circumstances are applicable:

Advance comments need not be solicited when urgent and compelling circumstances make solicitation of comments impracticable prior to the effective date of the coverage, such as when a new statute must be implemented in a relatively short period of time. In such case, the coverage shall be issued on a temporary basis and shall provide for at least a 30 day public comment period.

██ As the DFARS rule involves military procurement contracts, its promulgation is governed by the notice and comment requirements of the OFPP Act and FAR, not the APA. The interim DFARS rule notes as much therein. *See* 71 Fed. Reg. at 53046 (citing as authority for the interim rule the provisions authorizing the DFARS, 41 U.S.C. § 421 and 48 C.F.R.

Ch. 1). The DFARS rule was properly promulgated under these requirements. In the interim rule, DoD asserted that "urgent and compelling reasons exist to publish an interim rule prior to affording the public an opportunity to comment," namely that the rule was intended "to implement" a new statute, i.e., "Section 1211 of the National Defense Authorization Act for Fiscal Year 2006," which "prohibits DoD from acquiring United States Munitions List items from Communist Chinese Military Companies." 71 Fed. Reg. at 53045. DoD complied with 48 C.F.R. § 1.501–2(c) by providing for a 30–day public comment period after the issuance of the interim rule. *See* 71 Fed. Reg. at 53045 (notice of interim rule given Sept. 8, 2006, comments required by Nov. 7, 2006). The notice also provided that any "[c]omments received in response to this interim rule will be considered in the formation of the final rule," 71 Fed. Reg. at 53046, and they were so considered, 72 Fed. Reg. at 14239–40, in compliance with 48 C.F.R. § 1.501–2(a). Accordingly, the DFARS rule was properly promulgated, and enforcing the DFARS rule to the contract, awarded on January 26, 2007, does not violate the *Ex Post Facto* Clause of the Constitution.

## C. The DFARS rule is not unconstitutionally vague

██ The vagueness doctrine is an outgrowth of the Due Process Clause of the Fifth Amendment. *United States v. Williams,* —— U.S. ——, 128 S.Ct. 1830, 1845, 170 L.Ed.2d 650 (2008). A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. *Hill v. Colorado,* 530 U.S. 703, 732, 120

S.Ct. 2480, 147 L.Ed.2d 597 (2000). Defendants make two arguments in support of their claim that the DFARS rule is unconstitutionally vague: first, that the DFARS rule does not provide notice of the prohibited conduct to a person of common intelligence; second, that the DFARS rule conflicts with the authorizing statute, § 1211, such that ordinary people cannot determine the scope of prohibited conduct. Both arguments fail.

The DFARS rule prohibits acquisition of "supplies or services covered by the United States Munitions List (USML) (22 CFR part 121), *through a contract or subcontract at any tier,* from any Communist Chinese military company." 48 C.F.R. § 225.770–2 (emphasis added). The DFARS rule further provides that solicitations and contracts involving the delivery of items covered by the United States Munitions List must contain a clause that states that, "Any supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, *directly or indirectly,* from a Communist Chinese military company." 48 C.F.R. § 252.225–7007 (emphasis added). As noted above, this language is not ambiguous or unclear. It contemplates a prohibition on the procurement of munitions from a Communist Chinese military company at any stage of the supply chain. A person of ordinary intelligence could ascertain from the language "directly or indirectly" and "through a contract or subcontract at any tier" that the delivery of munitions procured through an intermediary country that had in turn obtained the munitions from the Communist Chinese military decades earlier was prohibited by the DFARS rule. *See generally Heaton v. United States,* 353 F.2d 288, 291 (9th Cir. 1965) (holding that the term "directly or indirectly" is to be read in "the broadest sense").

 Regarding the alleged conflict between § 1211 and the DFARS rule, the Court finds this argument to be without merit. The DFARS rule prohibits contractors and subcontractors selling munitions to the DoD from procuring these munitions from Communist Chinese military companies "directly or indirectly" and "through a contract or subcontract at any tier." This language closely tracks the language of § 1211 which prohibits the DoD from procuring munitions "through a contract or any subcontract (at any tier) under a contract, from any Communist Chinese military company." Further, the DFARS rule is a logical implementation of the statute. The statute was enacted to prohibit the DoD from procuring munitions from Communist Chinese military companies. The DFARS rule is designed, in turn, to effectuate that prohibition, by preventing those parties that facilitate the DoD's procurement of munition—contractors and subcontractors—from delivering under contract these prohibited munitions.

### D. The Superseding Indictment adequately alleges fraud (Counts 37–85).

#### 1. The fraud counts are not based on alleged breach of contract.

 Defendants argue that the fraud charges in the Superseding Indictment are invalid because the charges are based on breach of contract, which may not be used as the basis of fraud charges. However, as stated by the government, the Superseding Indictment affirmatively alleges fraud, not merely breach of contract. The Superseding Indictment alleges that the Defendants "knowingly and with intent to defraud, did devise and intend to devise a scheme and artifice to defraud and to obtain money from the United States and its agency, the Department of the Army, by means of material false and fraudulent

pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made." (D.E. 78 at 17.) The Superseding Indictment further alleges that the contract prohibited the Defendants from delivering munitions manufactured by Communist Chinese military companies (*id.* at 2), and that the Defendants "conceal[ed] and misrepresent[ed] the fact that the ammunition being provided pursuant to the contract was manufactured and originated in China" (*id.* at 4, 11, 18).

### 2. The fraud counts allege a scheme to defraud the government of money.

 Defendants also argue that the Superseding Indictment fails to adequately allege fraud because it essentially alleges that the DoD was defrauded of its "right of control" over the source of the munitions, and such an "intangible right" is not a property right that can be the basis of a fraud prosecution. Contrary to their claims, the Superseding Indictment alleges that the stated object of the fraud was to obtain *money* from the United States through the use of concealment and misrepresentations. (*Id.* at 11, 17–18.) Thus, the Superseding Indictment permissibly alleges that the government was defrauded of money, as provided for in the major fraud statute, 18 U.S.C. § 1031, and the wire fraud statute, 18 U.S.C. § 1343.

### E. The Superseding Indictment adequately alleges False Statement charges (Counts 2–36).

### 1. The language on the Certificates of Conformance, asking for "Manufacturer (point of origin)," is not invalid.

 The Superseding Indictment alleges that Defendants falsely stated on Certificates of Conformance that the "Manufacturer (point of origin)" of the

ammunition was "MEICO, Tirana, Albania." Defendants contend that no other forms promulgated under FAR and DFARS require the contractor to identify the "manufacturing" company. Defendants also contend that other forms and appendix instructions used in government procurement contracts define the term "point of origin" to mean shipping location. According to Defendants, "It would have made no sense for the [Certificate of Conformance] to suddenly add a requirement, the identity of the 'manufacturer,' that was not required by any statute or regulation, that was not sought on the companion DD Form 250 and that would have no bearing on the inspection process." (D.E. 163 at 29–30.) Defendants further contend that, "the sole purpose of the [Certificates of Conformance] is to be a substitute for an inspection at the shipping point and to ensure that the shipment is not 'defective' so that the government can reject damaged goods. For that reason, the phrase 'conform to the contract' is limited to issues pertaining to quality control, not the enforcement of embargoes or to find out where the goods may have been manufactured decades earlier." (*Id.* at 30.) Defendants' argument, the sum of their contentions, appears to be that, because other government procurement regulations and forms only require contracts to identify the shipping point as the "point of origin," because no other forms used in the government procurement process ask for the identity of the "Manufacturer," and because Certificates of Conformance are only used to ensure quality control, then the question on the Certificates of Conformance in this case, asking for "Manufacturer (point of origin)," impermissibly deviates from the pertinent regulatory requirements.

Defendants' argument fails for at least two reasons. First, the contract in this case explicitly incorporates the DFARS

rule which prohibits procurement of munitions from Communist Chinese military companies. Thus, it seems perfectly reasonable that the Certificate of Conformance, which exists to ensure that the shipment conforms with the contract, would ask the contractor to certify the "Manufacturer (point of origin)" of the ammunition. Whether other forms dealing with other kinds of procurement contracts do not contain similar language is irrelevant to whether the Certificate of Conformance was valid in this case. Second, as pointed out by the government, there is no prescribed Certificate of Conformance "form" that must be used. Although the FAR regulations provide that the Certificate of Conformance must include certain language to be used to certify that the supplies or services provided conform with all applicable requirements of the underlying contract,[7] there is nothing in the regulations regarding what *cannot* be included in a Certificate of Conformance.

 Defendants also argue that the language "Manufacturer (point of origin)" violates the APA's notice and comment requirement. As discussed above, the government procurement process is governed by the FAR not the APA. Under the FAR, "[c]omments need not be solicited when the proposed coverage does not constitute a significant revision." 48 C.F.R. § 1.501–3(a). "Significant revisions . . . means revisions that alter the substantive meaning of any coverage in the FAR System having a significant cost or administrative impact on contractors or offerors, or a significant effect beyond the internal operating procedures of the issuing agency." 48 C.F.R. § 1.501–1. Language in a Certificate of Conformance requesting that a contractor disclose the manufacturer of goods supplied under the contract is not a "significant revision" under this definition. As such, the Certificates of Conformance do not violate the FAR's notice and comment requirement.

**2. The truth or falsity of Defendants' answers on the Certificates of Compliance is a question for the jury.**

 Defendants also argue that the false statement counts must be dismissed because the question asking for "Manufacturer (point of origin)" is fundamentally ambiguous. The Eleventh Circuit has held that, "when a question is arguably ambiguous, the defendant's understanding of the question is a matter for the jury to decide," but "when a line of questioning is so vague as to be fundamentally ambiguous, the answers associated with the questions posed may be insufficient as a matter of law" to support a false statement prosecution. *United States v. Manapat*, 928 F.2d 1097, 1099 (11th Cir.1991) (internal citations and quotations omitted). A question is "arguably ambiguous" when " 'an answer would be true on one construction of [the] question but false on another.' " *United States v. Swindall*, 971 F.2d 1531, 1553 (11th Cir.1992) (*quoting United States v. Bell*, 623 F.2d 1132, 1136 (5th Cir.1980)). A question is "fundamentally ambiguous" when "it 'is not a phrase with a meaning about which men of ordinary intellect could agree.' " *Manapat*, 928

---

7. The FAR regulation states:
 The certificate shall read as follows:
 "I certify that on insert date insert Contractor's name furnished the supplies or services called for by Contract No. via [Carrier] on [identify the bill of lading or shipping document] in accordance with all applicable requirements. I further certify that the supplies or services are of the quality speci-

fied and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification (part number), and are in the quantity shown on this or on the attached acceptance document."
48 C.F.R. § 52.246–15(d).

F.2d at 1100 (*quoting United States v. Lattimore,* 127 F.Supp. 405, 410 (D.D.C.), *aff'd,* 232 F.2d 334 (D.C.Cir.1955)).

▮ The Court finds that the question "Manufacturer (Point of Origin)" is only arguably ambiguous, and consequently the truth or falsity of Defendants' statement that the "Manufacturer (point of origin)" of the munitions was "MEICO, Tirana, Albania." is a question for the jury. The point of the ambiguity argument is to determine whether the question that elicited the allegedly false statement is too ambiguous to allow a jury to speculate as to a defendant's intentions in making the statement. *See Manapat,* 928 F.2d at 1100–01 (holding that the questions at issue in that case— statements in a questionnaire regarding "Record of traffic convictions" and "Record of other convictions," buried in a list headed "Medical History" and purportedly concerned with medical conditions—were too ambiguous to allow a jury to speculate as to the defendant's intentions at the time she filled out the questionnaire). Given the language in the contract regarding prohibitions on the procurement of munitions from Communist Chinese military companies, and the allegations in the Superseding Indictment that the Defendants intentionally repackaged the munitions to disguise their true origins, a jury could find beyond a reasonable doubt that Defendants had knowingly and willfully made false statements on the Certificates of Conformance. That is, given the context of the language "Manufacturer (point of origin)" on the Certificates of Conformance, instructing the jury to decide whether Defendants knowingly and willfully answered this question falsely does not " 'ask the jury to aspire to levels of insight to which the ordinary person is incapable, and upon which speculation no criminal indictment should hinge.' " *Manapat,* 928 F.2d at 1100 (*quoting Lattimore,* 127 F.Supp. at 410).

### 3. Whether the identity of the manufacturer of the munitions is material.

▮ Defendants' remaining argument regarding dismissal of the false statement claims—that the identity of the manufacturer is insufficiently material to warrant liability under 18 U.S.C. § 1001—also fails. The materiality of the alleged false statements is an essential element of the offense and one certain to be contested in this case. As such, it is an issue properly decided by the jury.

### F. The Supplemental Motion requires the Court to look beyond the face of the Superseding Indictment.

▮ In their Supplemental Motion, Defendants AEY, Inc. and Efraim Diveroli attach internal United States Army emails received from the government during discovery. Defendants contend that the emails support the truthfulness of their statements in response to the question asking for "Manufacturer (point of origin)" on the Certificates of Conformance. The Court need not address the merits of their argument, as doing so would require the Court to look beyond the face of the indictment, which is prohibited on a motion to dismiss. It is well established that "the sufficiency of a criminal indictment is determined from its face." *United States v. Salman,* 378 F.3d 1266, 1268 (11th Cir. 2004) (*quoting United States v. Critzer,* 951 F.2d 306, 307 (11th Cir.1992)). It is equally well-settled that "a court may not dismiss an indictment ... on a determination of facts that should have been developed at trial." *United States v. Torkington,* 812 F.2d 1347, 1354 (11th Cir.1987). As discussed above, the truth or falsity of Defendant's responses to the question "Manufacturer (point of origin)" is a jury question.

Accordingly, it is hereby:

**ORDERED AND ADJUDGED** that Defendants AEY, Inc. and Efraim Diveroli's Motion to Dismiss (D.E. 163), Defendant Ralph Merrill's Motion to Dismiss (D.E. 164), and Defendants AEY, Inc. and Efraim Diveroli's Supplemental Motion (D.E. 235) are **DENIED.**