300

AEY, INC., Plaintiff,

v.

**UNITED STATES**, Defendant.

No. 09–330C.

United States Court of Federal Claims.

May 24, 2011.

Claude P. Goddard, Jr., Husch Blackwell Sanders, L.L.P., Washington, D.C., for plaintiff.

Christopher Bowen, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Kirk T. Manhardt, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Major Joseph Krill, Department of the Army, Arlington, VA.

## OPINION AND ORDER

LETTOW, Judge.

In this contract case, AEY, Inc. ("AEY") contends that the United States Army ("the Army") wrongfully terminated for default its contract with AEY, which contract required AEY to provide non-standard ammunition to the Army. The Army terminated the contract due to AEY's alleged failure to abide by a contractual provision that prohibited AEY from delivering to the Army ammunition that had been acquired from a Communist Chinese military company. AEY contends that it did not contravene the contractual provision at issue, or, alternatively, that the government is estopped from terminating its contract on the basis of any attendant breach due to the Army's acceptance of the allegedly nonconforming ammunition subsequent to the Army's discovery that the ammunition was indeed manufactured in China. AEY seeks relief in the form of: (1) a declaration

stating that AEY was not in breach of contract and that the Army's termination was a breach of contract and was barred by principles of ratification and estoppel, (2) an order converting the termination for default into a termination for convenience of the government, and (3) an award of such fees and expenses as permitted by law. Compl. at 10. Pending before the court is the government's motion to dismiss for failure to state a claim, and AEY's opposition to that request.

## BACKGROUND[1]

On January 26, 2007, the Army awarded AEY a firm-fixed-price requirements contract, Contract Number W52P1J–07–D–0004 ("the contract"), to provide non-standard ammunition for weapons used by the Afghan National Army and the Afghan National Police. Compl. ¶ 7. The contract expressly incorporated, via Amendment A 004, 48 C.F.R. § 252.225–7007, a provision of the Defense Federal Acquisition Regulation Supplement ("the DFARS clause" or "DFARS 252.225–7007"), which provides that supplies delivered under the contract "may not be acquired, directly or indirectly, from a Communist Chinese military company." DFARS 252.225–7007(b).

The Army issued to AEY five orders totaling $155,275,666.06 for various types of ammunition. Compl. ¶ 9. AEY commenced deliveries on May 18, 2007, and ultimately delivered nearly 100 million rounds of ammunition to the Army. Compl. ¶¶ 9, 10. AEY continued supplying ammunition until March 28, 2008, when the Army suspended deliveries. Compl. ¶ 9.[2]

As AEY concedes, a portion of the ammunition that it provided to the Army was originally manufactured in China sometime between 1965 and 1974. Compl. ¶ 11.[3] During that time, China "sold or otherwise provided" that ammunition to the government of Albania. Id. The ammunition was maintained by the Albanian government until 2007, when it was purchased by AEY through the Military Export and Import Company of Albania ("MEICO"). Id.

On April 16, 2008, the government issued a show cause notice, notifying AEY that the Army was considering terminating the contract for default because AEY had failed "to perform in accordance with the provisions of DFARS 252.225–7007" by supplying Chinese-manufactured ammunition to the Army. Compl. ¶ 13 (internal quotation marks omitted). AEY submitted a response in opposition to the government's position, but on May 23, 2008, the Contracting Officer issued a final decision terminating the contract for default for AEY's non-compliance with DFARS 252.225–7007. Id. ¶ 14.

On June 19, 2008, AEY and its officers were indicted in the United States District Court for the Southern District of Florida for acts in connection with the delivery of Chinese-manufactured ammunition under this same contract. See Indictment, *United States v. AEY, Inc., et al.*, No. 08–20574 (S.D.Fla. June 19, 2008), ECF No. 1. A superseding indictment was filed on July 17, 2008, which charged AEY and its officers with: (1) conspiracy to make false statements (18 U.S.C. § 1001(a)(2)), conspiracy to commit major fraud against the United States (18 U.S.C. § 1031), and conspiracy to commit wire fraud (18 U.S.C. § 1343), all in violation of the federal conspiracy statute (18 U.S.C. § 371) (Count 1); (2) substantive false-statement violations (18 U.S.C. § 1001(a)(2)) (Counts 2–36); (3) substantive major fraud violations (18 U.S.C. §§ 2, 1031) (Counts 37–71); and (4) substantive wire fraud violations

1. For the purposes of resolving the pending motion, the court presumes that the allegations in AEY's complaint are true. The recitation of facts is provided solely for purposes of providing a background for analysis of the motion and does not constitute findings of fact by the court. Unless otherwise noted, however, the facts set out appear to be undisputed.

2. The government avers that it paid for the ammunition through December 6, 2007. *See* Def.'s Mot. to Dismiss ("Def.'s Mot.") at 2. AEY has filed a separate complaint for damages amounting to $509,267.05, representing ammunition for which it allegedly has not been paid. *See* Complaint at 1, *AEY, Inc. v. United States*, No. 10–733C (Fed.Cl. Oct. 28, 2010), ECF No. 1.

3. The parties do not provide an estimate of what portion of the deliveries was manufactured in China, but AEY avers that the deliveries were composed of "7.62x39mm and 7.62x54mm ammunition." Compl. ¶ 10.

(18 U.S.C. §§ 2, 1342) (Counts 72–85). *See* Notice of Filing Ex. 1, Superseding Indictment, at 3–4, 8, 10, 17, 20, *AEY v. United States*, No. 09–330 (Fed.Cl. May 3, 2011), ECF No. 24 ("Superseding Indictment"). On March 24, 2009, the district court issued an order denying AEY's motion to dismiss the Superseding Indictment, and found as a matter of law that the prohibition contained within the DFARS clause and the associated statute and regulations encompassed the Chinese-manufactured ammunition. *See United States v. AEY, Inc.*, 603 F.Supp.2d 1363, 1372–75, 1381 (S.D.Fla.2009).

AEY filed its complaint in this court on May 22, 2009, alleging that AEY had not breached the contract because the Chinese-manufactured ammunition was purchased from Albania, which in turn had bought or received the ammunition from China decades prior to AEY's purchase, and the DFARS clause only prohibits the acquisition of such items via contract or subcontract with a Communist Chinese military company. Compl. ¶¶ 16–24. Alternatively, AEY alleges that, to the extent its delivery of Chinese-manufactured ammunition constituted a breach of contract, the Army forfeited its ability to terminate the contract for default on this ground because the Contracting Officer and the Army knew the source of the ammunition and continued to accept AEY's delivery for a period after gaining knowledge. *Id.* ¶ 25.

The government filed a motion to dismiss AEY's complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") on July 21, 2009. In that motion, the government argues that the district court's pretrial order collaterally estops AEY from contending that its supply of Chinese-manufactured ammunition was not a violation of the DFARS clause. Def.'s Mot. at 3–4. Alternatively, the government asserts that AEY cannot prevail because its actions contravened the DFARS clause, *id.* at 10, and the government did not waive its right to terminate for default on this ground. *Id.* at 14. AEY opposed the government's motion on August 21, 2009, arguing, among other things, that the district court's pretrial order cannot serve as a predi-

cate for collateral estoppel because that order did not constitute a final judgment. *See* Pl.'s Resp. at 6.

On August 28, 2009, AEY pled guilty in the district court to Count 1 of the Superseding Indictment. Plea Agreement ¶ 1, *United States v. AEY, Inc., et al.*, No. 08–20574 (S.D.Fla. Aug. 28, 2009), ECF No. 328 ("Plea Agreement"). Shortly thereafter, on September 4, 2009, this court granted a motion by the government to stay the proceedings in this case to allow the case in the district court to come to conclusion with the sentencing of AEY. On January 3, 2011, AEY was sentenced to two years of probation. *See* Def.'s Reply at 2. The court lifted the stay in these proceedings on January 18, 2011, and on February 3, 2011, the government filed a reply in support of its motion to dismiss. A hearing was held on May 3, 2011, and the government's motion is accordingly ready for disposition.

## DISCUSSION

### A. *Motion for Summary Judgment*

Rule 12(d) provides that "[i]f, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56." In this instance, both AEY and the government have submitted materials outside the pleadings, including a copy of the Superseding Indictment filed in the Southern District of Florida. Those materials are quite pertinent to the resolution of the pending motion, and the court has relied on them in formulating its conclusions in this case. Accordingly, the government's motion to dismiss for failure to state a claim is converted to a motion for summary judgment. *See, e.g., Speed v. United States*, 97 Fed.Cl. 58, 64 (2011).

A grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). A material fact is one "that might affect the outcome of the suit under the governing

law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

■ The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Consequently, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). If the moving party establishes that there is no genuine issue of material fact, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." RCFC 56(e)(2). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). For cases in which a plaintiff contests the validity of a termination for default, "[t]he government bears the burden of proof in establishing the validity of [such] termination." *Johnson Mgmt. Grp., CFC, Inc. v. Martinez,* 308 F.3d 1245, 1249 (Fed.Cir.2002); *see also McDonnell Douglas Corp. v. United States,* 567 F.3d 1340, 1351 (Fed.Cir.2009); *United Partition Sys., Inc. v. United States,* 90 Fed.Cl. 74, 88 (2009).

### B. *Collateral Estoppel*

■ Under the doctrine of collateral estoppel, otherwise known as issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *see United States v. Stauffer Chem. Co.,* 464 U.S. 165, 170–71, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984) ("[C]ollateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action."). Collateral estoppel may operate only if:

(1) an issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) the resolution of the issue was essential to a final judgment in the first action; and (4) the party defending against issue preclusion had a full and fair opportunity to litigate the issue in the first action.

*Shell Petroleum, Inc. v. United States,* 319 F.3d 1334, 1338 (Fed.Cir.2003); *see also Banner v. United States,* 238 F.3d 1348, 1354 (Fed.Cir.2001) (same). Any doubts regarding whether the requirements for collateral estoppel have been met are resolved against the party invoking the doctrine. *See Petro–Hunt L.L.C. v. United States,* 90 Fed.Cl. 51, 69 (2009).

■ In moving to dismiss the Superseding Indictment in the district court, AEY argued that the DFARS clause did not apply to the ammunition delivered under the contract. *AEY,* 603 F.Supp.2d at 1372. In its pretrial order on this motion, the district court was careful to note at the outset that AEY was "not charged with violating the DFARS rule[;]" rather, it was charged with "concealing and misrepresenting the fact that the ultimate source of munitions [it] delivered to the [Department of Defense] was a Communist Chinese military company in violation of the DFARS rule." *Id.* at 1370. The district court concluded that "as a matter of law" "the DFARS [r]ule applies to the munitions delivered under the contract" by AEY. *Id.* at 1372. Thus, the precise issue in this case, whether AEY's supply of Chinese-manufactured ammunition violated the DFARS clause, was before the district court and actually litigated in connection with that court's pretrial order.[4]

---

4. An issue is "actually litigated" if it "was properly raised by the pleadings, was submitted for determination, and was determined." *Banner,* 238 F.3d at 1354.

Turning to the third requirement of collateral estoppel—whether resolution of the issue was essential to a final judgment in the first action—the Federal Circuit has elaborated on the "finality" element of that prerequisite:

> A determination is conclusive in a subsequent action between the same parties only when the "issue of fact or law is actually litigated *and* determined by a valid and final judgment." *Restatement (Second) of Judgments* § 27 (1982) (emphasis added). *See also Young Engineers, Inc. v. United States Int'l Trade Comm'n,* 721 F.2d 1305 (Fed.Cir.1983). One important factor that is considered in determining the finality of a decision for the purposes of preclusion is whether the decision was ever subject to appeal. *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2d Cir.1961), *cert. denied,* 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). In *Lummus Co.,* 297 F.2d at 89, Judge Friendly stated that whether a "non-final" judgment "ought nonetheless be considered 'final' in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision (*i.e.,* that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *See also Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 996 (7th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980). The *Restatement (Second) of Judgments* § 13 comment g (1982) also indicates that a decision that is not subject to appeal is not final for the purposes of issue preclusion. *See also Interconnect Planning Corp. v. Feil,* 774 F.2d 1132 (Fed.Cir.1985).

*Block v. United States Int'l Trade Comm'n,* 777 F.2d 1568, 1571–72 (Fed.Cir.1985). In *Block,* the court, in considering an appeal of a decision by the International Trade Commission ("ITC") to terminate its self-initiated investigation regarding potential patent infringement, addressed the appellant's concern that if a new investigation were opened it would be bound via res judicata or collateral estoppel to the findings of the opinion accompanying the ITC's termination order. *Id.* at 1569–71. The court denied such a possibility, noting that "because the ITC did not enter an appealable final judgment, there has been no opportunity for appellate review and appellant will not be bound in any way by the statements in the opinion accompanying the ITC order." *Id.* at 1572. Similarly, in *Interconnect Planning,* the court rejected the defendant's invocation of collateral estoppel based on a prior district court's grant of summary judgment in its favor because the district court had not entered a final, appealable judgment. 774 F.2d at 1135–36. In this regard, the court stated "[s]ufficient firmness [for purposes of collateral estoppel], according to the Restatement [ (Second) of Judgments § 13 (1982) ], requires that the party against whom the estoppel is asserted have had the right, even if not exercised, to challenge on appeal the correctness of the earlier decision." *Id.* at 1135; *see also Banner,* 238 F.3d at 1355 (stating, in dicta, that "[c]ollateral estoppel requires that a party have had an opportunity to appeal a judgment as a procedural matter").

The government points to seemingly contrary statements from the Federal Circuit, *see* Def.'s Mot. at 8–9, in cases involving the court's review of patent litigation arising out of the district courts, in which the Federal Circuit "appl[ies] the [procedural] law of the regional circuit." *Dana v. E.S. Originals, Inc.,* 342 F.3d 1320, 1323 (Fed.Cir.2003). In those types of decisions, the Federal Circuit plainly relies upon regional circuit precedent regarding collateral estoppel. *Id.* at 1323–25. Even within that context, the Federal Circuit has stressed that a " 'full and fair opportunity to litigate' a particular issue includes a party's ability to appeal ... [, and] a 'resolution' and 'final judgment' envision a complete adjudicative process." *Innovad Inc. v. Microsoft Corp.,* 260 F.3d 1326, 1334 (Fed.Cir. 2001); *see also RF Del., Inc. v. Pacific Keystone Techs., Inc.,* 326 F.3d 1255, 1262 (Fed. Cir.2003) (concluding that a district court's two interlocutory orders on summary judgment motions had not met standard for finality where "there was no judgment, nor a certification of a final order[;] [r]ather the entire action ... was resolved solely between the parties").

In this case, the district court's pretrial order was not a final judgment, and AEY was never afforded the opportunity to appeal its findings. In the words of the Federal Circuit, "a decision not final, not certified, not appealed, and mooted by subsequent events, lacks collateral estoppel effect for the purpose urged by [the government]." *Interconnect Planning*, 774 F.2d at 1136.

The government argues in its reply, however, that "[t]hrough its plea agreement and sentencing, AEY has established the finality of the [pretrial order] ... regardless of the posture prior to the plea." Def.'s Reply at 3. Conceptually, such "finalization" of the pretrial order could only occur if the guilty plea encompasses as a necessary predicate the legal finding that AEY's supply of Chinese-manufactured ammunition was in violation of the DFARS clause. If AEY's violation of the DFARS rule was not essential to the guilty plea, then the plea cannot be used as a pathway to collateral estoppel. *See In re Freeman*, 30 F.3d 1459, 1466 (Fed.Cir.1994) ("[T]o give preclusive effect to a particular finding in a prior case, that finding must have been necessary to the judgment rendered in the previous action." (citing *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Restatement (Second) of Judgments* § 27 cmt. j (1980))). The "incidental or collateral determination of a nonessential issue ... [cannot] preclud[e] reconsideration of that issue in later litigation." *In re Freeman*, 30 F.3d at 1466.

What the government ignores in this respect is the critical schism that lies between the findings of the district court and the conspiracy charges to which AEY ultimately pled guilty. As noted, AEY pled guilty to Count I of the Superseding Indictment, which charged AEY with "conspiring to make false statements, in violation of [18 U.S.C. § 1001(a)(2)], conspiring to commit major fraud against the United States, in violation of [18 U.S.C. § 1031], and conspiring to commit wire fraud, in violation of [18 U.S.C. § 1343], all in violation of [18 U.S.C. § 371 ('Conspiracy to commit offense or to defraud United States')]." *Plea Agreement* ¶ 1.[5] Factually, Count I consisted of the allegation that AEY and its principals sought to "unjustly enrich themselves and derive a benefit by concealing and misrepresenting the fact that the ammunition being provided pursuant to the contract *was manufactured and originated in China*." Superseding Indictment at 4 (emphasis added). The "manner and means" of that conspiracy included AEY's "remov[al] of Chinese markings from containers, so as to conceal the fact that the ammunition was manufactured and originated in China," "falsely represent[ing] in a Certificate of Conformance that the manufacturer and point of origin of the ammunition being delivered was [MEICO] in Tirana, Albania," and submitting a false certification that "the ammunition being furnished conformed in all respects with the contract requirements." *Id.* at 4–5.

Thus, there were at least three mechanisms by which AEY accomplished its conspiracy, two of which do not necessarily rely upon a finding that its supply of the ammunition at issue was in violation of the DFARS clause. In particular, the repackaging of the ammunition and the representation that Albania was the ammunition's "point of origin" could independently run afoul of 18 U.S.C. § 1001(a)(2), 18 U.S.C. § 1031, and 18 U.S.C. § 1343. As the district court explicitly noted, "even if the munitions did not violate the DFARS rule's prohibition, [AEY] might still be liable for the conspiracy, fraud, and false statement charges, depending on the materi-

5. Section 1001(a)(2) authorizes criminal sanctions for the "knowing[] and willful[] ... mak[ing of] any materially false, fictitious, or fraudulent statement or representation." Similarly, Section 1031(a) allows for the criminal prosecution of a person who "knowingly executes, or attempts to execute, any scheme or artifice with the intent ... to defraud the United States[] or ... to obtain money or property by means of false or fraudulent pretenses, representations, or promises" in a grant, contract, or similar agreement. Section 1343 allows for the criminal prosecution of "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

ality of their alleged deceptions and concealment." *AEY*, 603 F.Supp.2d at 1372, n. 2.

■ In sum, there is nothing within the superseding indictment or the plea agreement itself that demonstrates that a violation of the DFARS clause was an essential element of the charges to which AEY pled guilty such that the guilty plea can be given preclusive effect or can be said to have rendered final the district court's prior judicial determination of this precise issue.[6] Collateral estoppel is consequently inappropriate in this case, and the court accordingly must determine whether AEY's supply of Chinese-manufactured ammunition was in fact a violation of the DFARS clause.

### C. *The DFARS Clause*

■ As in all cases involving interpretation of a statute or regulation, the court looks first to the text itself. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *Sursely v. Peake*, 551 F.3d 1351, 1355 (Fed.Cir.2009); *American Airlines, Inc. v. United States*, 551 F.3d 1294, 1299 (Fed.Cir.2008). In doing so, the court endeavors to give the text its plain meaning. *American Airlines*, 551 F.3d at 1299. Where the language provides "a clear answer" to the question at hand, the interpretive inquiry concludes. *Hughes Aircraft*, 525 U.S. at 438, 119 S.Ct. 755; *see also Sursely*, 551 F.3d at 1355. "When a statute is not clear on its face or does not speak directly to an issue, the interpretation provided by the relevant agency's regulations warrant deference in keeping with *Chevron, U.S.A., Inc. v. Natural Res[.] Def[.] Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *American Airlines*, 551 F.3d at 1299–1300. Similarly, "[w]hen the language of a regulation is ambiguous or susceptible to more than one plausible reading, [the court] defer[s] to the agency's inter-

pretation of its own regulations." *Id.* at 1300.

The DFARS clause is a product of Section 1211(a) of the National Defense Authorization Act for Fiscal Year 2006, Pub.L. No. 109–163, 119 Stat. 3136, 3461, 10 U.S.C.A. § 2302 note, which provides, in relevant part that "[t]he Secretary of Defense may not procure goods or services described in subsection (b) ['goods and services on the munitions list of the International Trafficking in Arms Regulations'], through a contract or any subcontract (at any tier) under a contract, from any Communist Chinese military company." DFARS § 225.770–2 implements the prohibition contained within Section 1211 and states:

> Do not acquire supplies or services covered by the United States Munitions List (USML) (22 CFR part 121), through a contract or subcontract at any tier, from any Communist Chinese military company. This prohibition does not apply to components and parts of covered items unless the components and parts are themselves covered by the [United States Munitions List].

To effectuate that prohibition, DFARS § 252.225–7007 provides that the following clause must be included in solicitations and contracts involving the delivery of items covered by the United States Munitions List:

> Prohibition On Acquisition of United States Munitions List Items From Communist Chinese Military Companies (SEP 2006)
>
> · · ·
>
> (b) *Any supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, directly or indirectly, from a Communist Chinese military company.*

(emphasis added).[7] It is this particular clause, "the DFARS clause," that AEY alleg-

---

**6.** In some circumstances, a guilty plea, on its own, can collaterally estop the relitigation of an issue of law or fact that is necessarily established as part of that plea. *See Samuel T. Isaac & Assocs., Inc. v. United States*, 7 Cl.Ct. 255, 258 (1985) ("A prior criminal conviction establishes conclusively the facts underlying the conviction for purposes of a subsequent civil proceeding[ ] involving the same parties; and this rule of col-

lateral estoppel is operative whether the conviction is obtained by jury verdict or as the result of a guilty plea.").

**7.** For a detailed account of the historical background underpinning the enactment of Section 1211 of the National Defense Authorization Act for Fiscal Year 2006, and the adoption of DFARS clause, see *AEY*, 603 F.Supp.2d at 1370–72.

edly breached in providing Chinese-manufactured ammunition to the Army.[8]

In AEY's view, "[a]ll of these provisions ... plainly extend only to supplies acquired through a prime contract or a subcontract issued under the prime contract [and because] ... there was no subcontract issued under AEY's prime contract at any tier ... to any Communist Chinese military company" AEY was not in breach of the contract. Pl.'s Opp'n at 14; *see also* Hr'g Tr. 15:9 to 24 (May 3, 2011).[9] In this connection, AEY argues that the DFARS clause bars only the "acquisition of such items, post-September 2006, from Communist Chinese [m]ilitary [c]ompanies [—i]n other words, the clause bars current transactions with Communist Chinese [m]ilitary [c]ompanies." Compl. ¶ 18 (internal quotation marks omitted). Pointing to the reasoning in the district court's opinion, the government contends that Section 1211 and the implementing DFARS provisions effect a broad ban against the acquisition of any qualifying goods or services regardless of when such ammunition was manufactured or at what stage the ammunition was acquired in the contractual chain. Def.'s Reply at 5–6.[10]

■ The language "through a contract or subcontract at any tier," contained within Section 1211 and DFARS 225.770–2, is open to varying interpretations. This phrase, particularly the "at any tier" portion, certainly lends itself to the reading accepted by the district court and now offered by the government to include goods or services procured "from a Communist Chinese military company at any step in the supply chain." *AEY*, 603 F.Supp.2d at 1373. Under this view, the Secretary, when contracting for supplies or

services, may not acquire the proscribed goods regardless of whether those supplies or goods were acquired via a contract or subcontract with a Communist Chinese military company. Nevertheless, it could be argued, as AEY asserts, that the qualifying "through a contract or subcontract" language prohibits the acquisition of such materials only through those precise mechanisms— that is, a Communist Chinese military company would have to be a party to a contract or subcontract at some tier of the acquisition process for a violation to occur.

The potential ambiguity within Section 1211 and DFARS 225.770–2 is resolved, however, by DFARS 252.225–7007—the clause actually contained within the contract. In more definite terms, DFARS 252.225–7007 provides that AEY could not deliver ammunition to the Army that it "acquired, *directly or indirectly,* from a Communist Chinese military company." (emphasis added). This text plainly prohibits AEY's "indirect" acquisition and delivery of the Chinese-manufactured ammunition. *See Webster's Third New Int'l Dictionary* 1151 (2002) (defining "indirect" as "deviating from a direct line or course; not proceeding straight from one point to another; [or] proceeding obliquely or circuitously."). It does not include the potentially restrictive language of "through a contract or subcontract," and there is no temporal limitation within this phrase restricting its terms to acquisition of goods where the goods leave the hands of the Communist Chinese military company subsequent to the issuance of the primary contract. Nor is it subject to the reading, which AEY urges, that a passage of some forty years between MEICO's acquisition of the ammunition from China and

---

8. Exceptions to the DFARS prohibition pertain to supplies or services acquired in connection with a visit to the People's Republic of China by a vessel or an aircraft of the United States armed forces, for testing purposes, or for the purpose of gathering intelligence. *See* DFARS § 225.770–3. None of those exceptions apply here.

9. The parties do not appear to dispute that other definitional provisions of Section 1211 and the DFARS prohibition apply to Chinese-manufactured ammunition, or that the ammunition provided qualifies as a "good or service" for the purposes of Act and that such ammunition was manufactured by a "Communist Chinese military

company." Accordingly, the court does not recite the extensive statutory and regulatory text governing those definitions.

10. Relying primarily on the text of the relevant provisions, the district court concluded that AEY's interpretation "conflict[ed] with the plain meaning of [Section] 1211 and the DFARS rule, which prohibit the sale of munitions acquired from a Communist Chinese military company, either directly or indirectly, regardless of when or through what means the munitions were so acquired." *AEY*, 603 F.Supp.2d at 1373.

AEY's acquisition from MEICO somehow renders the transaction permissible under DFARS 252.225–7007. In this respect, the court concurs with the conclusion of the district court that "[t]he phrase 'directly or indirectly' is not ambiguous—it encompasses the entire universe of means of acquisition of munitions from a Communist Chinese military company, including those through third-party intermediary nations, regardless of when the intermediary nation acquired the munitions from the Communist Chinese military [company]." *AEY*, 603 F.Supp.2d at 1373. Because the text is plain in this regard, the court need look no further.[11]

In sum, Section 1211 and DFARS 225.770–2 may allow some room for conflicting interpretations, but the government's interpretation of those provisions is entirely reasonable and well within the boundaries of the text. *See American Airlines*, 551 F.3d at 1299–1300. More importantly, DFARS 252.225–7007—the DFARS clause which the contract explicitly incorporated—does not have the same potential ambiguity, and plainly prohibits AEY's "indirect" acquisition of the ammunition it delivered to the Army from a Communist Chinese military compa-ny. Consequently, AEY breached its contract with the Army, thereby entitling the Army to terminate the contract for default.

### D. *Equitable defenses to breach*

AEY contends that even if its supply of Chinese-manufactured ammunition was a breach of contract, "the Army lost its ability to terminate AEY's contract for such breach, because the Contracting Officer and the Army, with full knowledge of the alleged breach no later than September 17, 2007—and perhaps as early as May 24, 2007, knew that AEY was providing Chinese-manufactured ammunition ... and continued to accept and pay for deliveries." Compl. ¶ 25. AEY alleges that the doctrines of waiver, ratification, and estoppel thereby prevent a termination for default in its case. *Id.* ¶ 26.

▮▮▮ Although a plaintiff must show varying elements to benefit from the respective doctrines of waiver, ratification, and estoppel,[12] AEY's invocation of these defenses fails for an overriding reason. It is axiomatic that " 'the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement

---

11. AEY insists that the government's present interpretation of the DFARS clause contradicts an answer it provided to a pre-proposal question, which answer was incorporated into the Solicitation via Amendment A 0002. Compl. ¶ 21. In response to the question of whether "ammunition from China [is] acceptable for this contract[,]" the Army responded as follows:

The solicitation itself does not expressly prohibit any source of supply, but requires the ammunition [to] be compatible with the identified weapon systems in good working order. However, any other statutory restrictions, such as exporting and importing licensing requirements[] that may effectively prohibit supplies from any source are the responsibility of each offeror to both identify and resolve.

*Id.* In fact, the Army's answer to this question is not specifically inconsistent with the government's present interpretation of the DFARS clause, nor is the absence of a statement alerting the questioner or offeror as to the prohibition contained in the DFARS clause significant in light of the warning that potential contractors were required to ascertain and ensure compliance with any "statutory restrictions ... that may effectively prohibit supplies from any source." *Id.*

12. Waiver is usually found where "over the course of a great number of *prior similar con-*tracts, the government failed to enforce a particular requirement or set thereof." *L.P. Consulting Grp., Inc. v. United States*, 66 Fed.Cl. 238, 241 (2005) (emphasis added); *see also International Res. Recovery, Inc. v. United States*, 60 Fed.Cl. 428, 431–32 (2004). Ratification of a subsequent contract modification with the government "requires knowledge of material facts involving the unauthorized act and approval of the activity *by one with authority.*" *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1347 (Fed.Cir.2007) (emphasis added); *see also Doe v. United States*, 48 Fed.Cl. 495, 503–04 (2000). To successfully invoke equitable estoppel against the government, "a plaintiff must show that it [reasonably] relied on [the government's] conduct in such a manner as to change his position for the worse," and "affirmative misconduct" on the part of the government. *People of Bikini, ex rel. Kili/Bikini/Ejit Local Gov. Council v. United States*, 77 Fed.Cl. 744, 768 (2007) (internal quotation marks omitted); *see also Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed.Cir.2000).

Notably, AEY has not alleged that the government waived the DFARS clause in any other prior contracts, nor has it shown that one with authority knowingly approved its delivery of the prohibited ammunition, nor has it put forth any facts demonstrating affirmative misconduct on the part of the government.

to do or cause to be done what the law does not sanction or permit.' " *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 420, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (quoting *Utah Power & Light Co. v. United States,* 243 U.S. 389, 408–09, 37 S.Ct. 387, 61 L.Ed. 791 (1917)); *see also Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 380, 384–86, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (government was not estopped from denying insurance benefits to farmer who had been told by government agent that insurance would cover certain crops, which crops were in reality not eligible for federal insurance under the applicable regulation). This principle has been invoked frequently in the realm of government contracts, and the Federal Circuit has emphasized that where a contracting officer has not been provided authorization to depart from regulatory requirements, "any deviation from regulatory requirements is a violation of the regulations and beyond the authority of the contracting officer." *Johnson Mgmt. Grp., CFC,* 308 F.3d at 1256 n. 2. In this respect, "[t]he government 'is not bound by its agents acting beyond their authority and contrary to regulation.' " *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1321 (Fed.Cir. 1997) (quoting *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1153 (Fed.Cir. 1983)); *see also Urban Data Sys.,* 699 F.2d at 1154 ("[T]he United States will not be estopped to deny the acts of its agents who have acted beyond the scope of their actual authority.").

The FAR plainly provides that contracting officers only possess authority to bind the government in relation to contracts for which "all requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met." 48 C.F.R. § 1.602–1(b). In this vein, DFARS 225.770–5 explicitly provides that only the Under Secretary of Defense (Acquisition, Technology, and Logistics), the Secretaries of the military departments, or the Component Acquisition Execu-

tive of the Defense Logistics Agency may waive the requirement that the military must not purchase proscribed goods or services from Communist Chinese military companies, and it further dictates that such power of waiver may not be delegated. The governing provisions thus make plain to all precisely who were the parties entitled to waive the DFARS clause. *See Merrill,* 332 U.S. at 384–85, 68 S.Ct. 1 ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."). Accordingly, even if the Army continued to accept the Chinese-manufactured ammunition after discovering its true origins, such action was taken without the cloak of governmental authority. As a result, the continued acceptance of prohibited ammunition did not prevent the United States from terminating for default AEY's contract on this ground.

### CONCLUSION

The court is persuaded that there is no genuine issue of material fact that prevents the grant of summary judgment in the government's favor. As a matter of law, AEY breached the DFARS clause of the contract through its supply of Chinese-manufactured ammunition, and the government accordingly has established the validity of its termination for default on that ground.[13] For the reasons stated, the government's motion for summary judgment is GRANTED. The clerk shall enter judgment in accord with this disposition.

No costs.

It is so ORDERED.

---

13. Additionally, AEY's claim against the United States would arguably fail due to 28 U.S.C. § 2514, which provides that "[a] claim against the United States shall be forfeited to the United States by any person who corruptly practices *or attempts to practice* any fraud against the United States in the proof, statement, establishment, or allowance thereof." (Emphasis added.). AEY's plea of guilty to Count I, encompassing the various conspiracy charges, would very likely fall under Section 2514 and thus effect a forfeiture of AEY's claim.